John D. ELLIOTT, C. Leonard Davis,
Plaintiffs–Appellants,

The Atlanta Union Mission, d/b/a
The Potter's House, Plaintiff,

v.

The CITY OF ATHENS, GEORGIA, and
the Mayor and Council of the City of
Athens, Georgia, Dwain P. Chambers,
Miriam Moore, Harry Sims, Cardee Kil-
patrick, Kathy Hoard, Linny Bailey,
Mac Coile, Carolyn Reynolds, Gwen
O'Looney and Calvin Bridges, Defen-
dants–Appellees.

No. 91–8147.

United States Court of Appeals,
Eleventh Circuit.

May 19, 1992.

Bradley S. Wolff, Arrington & Hollowell,
P.C., Atlanta, Ga., for plaintiffs-appellants.

David K. Flynn, Irving Gornstein, U.S. Dept. of Justice, Washington, D.C., for amicus U.S. Dept. of Justice.

Frank E. Jenkins, Kirk R. Fjelstul, III, Jenkins & Eells, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH, ANDERSON and BIRCH, Circuit Judges.

ANDERSON, Circuit Judge:

This case presents a challenge to a local zoning ordinance of the City of Athens, Georgia, pursuant to the 1988 amendments to the Fair Housing Act, 42 U.S.C.A. § 3601, et seq. (hereinafter referred to as the "FHA" or the "Act"). Appellants seek to establish a group home for recovering alcoholics in an area of Athens zoned for single-family occupancy. The district court held that there was no violation of the FHA, and appellants appealed.

## I. FACTS

Appellants, John D. Elliott and C. Leonard Davis, are owners of a single lot located at 490–490½ Ruth Street in Athens, Georgia, which contains two detached houses. Appellants sought to sell the property to The Potter's House, a division of the Atlanta Mission, for use as an alcohol and drug rehabilitation center. The sale was contingent on obtaining approval for the proper zoning to accommodate The Potter's House.

The City of Athens, Georgia, is divided into various zoning districts with local ordinances defining the permitted uses for each zone. Within the city limits, there are three types of single-family residential districts (RS–10, RS–15, and RS–20), two types of multi-family residential districts (RM–1 and RM–2), and several types of general residential, commercial, industrial, and governmental districts.

The property at issue is located in an area zoned RS–10 for single-family use pursuant to the local ordinance.[1] Under the ordinance, a family is defined as:

One (1) or more persons occupying a single dwelling unit, provided that unless all members are related by blood, marriage or adoption, no such family shall contain over four (4) persons. Domestic servants employed on the premises may be housed on the premises without being counted as a separate family or families. In addition, a related family may have up to two (2) unrelated individuals living with them. The term "family" does not include any organization or institutional group.

Athens, Ga., Code § 9–1–4 (1987). Thus, under the ordinance an unlimited number of related persons may reside together, while a maximum of four unrelated individuals may occupy a single residence. Although the zoning ordinance permits only one single-family structure per lot, a grandfather clause allows the two structures on the Ruth Street property to remain as they were built prior to the adoption of the ordinance. As a result, two "families" or a maximum of eight unrelated persons are permitted to reside on the property.

The City of Athens adopted its definition of "family," which restricts the number of unrelated persons who may live together, in order to regulate the large student population from the University of Georgia campus located in Athens and to protect the

---

1. The following are permitted uses in an RS–10 zone:

    (1) Single-family;
    (2) Parks and recreational areas publicly owned and operated;
    (3) Horticulture activities and the raising of farm animals, including horses, for noncommercial purposes;
    (4) Governmental buildings—federal, state and local;
    (5) Subdivision recreational areas owned, operated, and maintained by homeowners' associations exclusively for the use of residents and their guests;
    (6) Family day care homes;
    (7) Accessory uses as defined by section 9–1–4 and in accordance with section 9–1–14, except limited to one hundred (100) feet of setback if located in the front yard.

    Athens, Ga., Code § 9–1–143 (1987) (RS–10 Single–Family Residential District (10,000 square feet)).

single-family character of the neighborhoods surrounding the university. The City was attempting to prevent the adverse effects that can occur when an area increases its population density because of a large demand for rental apartments for students. The City was concerned particularly with overcrowding, traffic, noise, and the excess demand on city services such as transportation and water.

In this case, the proposed purchaser of the Ruth Street property, The Potter's House, operates an alcohol and drug rehabilitation center for men at its farm facility in Jefferson, Georgia. The male residents of The Potter's House are employed in one of the four stores operated by The Potter's House or in some part of the farm operation. Reverend Jack Lindsay, director of The Potter's House, sought to purchase the Ruth Street property for use as a group-residence home, or "half-way" house, for men who had finished the program at the farm facility but were not yet ready to live on their own. The Athens residence home would thus serve as a second stage in the rehabilitation process, providing structure and support to those program participants who had completed the first part of the program.

The Potter's House planned to accommodate twelve male program participants[2] and at least one staff member at the Ruth Street property. Thus, the planned occupancy was in excess of the eight permitted residents under the ordinance. The program participants would be employed outside the property and would be subject to program rules prohibiting the use of alcohol and overnight female visitation. These participants would pay $75.00 per week in exchange for their food, clothing, shelter, and supervision.

In order to carry out their project, appellants approached the City of Athens planning department to have the property rezoned to multi-family designation which would permit the proposed use for the halfway house. The planning department advised appellants that the proposed use of the Ruth Street property would be considered, under a "similar use" provision, as a boarding house.[3] Members of the planning department then studied the impact the proposed zoning change would have on the neighborhood and the demand for municipal services. While the planning department determined that the proposed group home would not burden the provision of municipal services such as transportation, water, and sewage, the department nonetheless recommended denial of the proposed change, stating as its reasons that the rezoning would set a negative precedent for the neighborhood and would constitute spot zoning.

Thereafter, the appellants requested that the City either issue an interpretation of the current ordinance which would permit the intended use under the current definition of "family" or amend the ordinance so that it would conform to the provisions of the FHA amendments.

After the City failed to issue the requested interpretation of the current ordinance or to amend the ordinance, the appellants instituted suit in the district court on November 6, 1989. Appellants sought declaratory and injunctive relief on the grounds that the City's actions violated the Fair Housing Act and their rights of substantive due process and equal protection.[4] More particularly, appellants alleged that handicapped persons were denied the opportunity to reside within single-family residential neighborhoods in the City of Athens, Georgia, and that the City refused to

---

2. The parties stipulated at trial that the persons who would reside at the Ruth Street property are handicapped within the meaning of 42 U.S.C. § 3602(h) and are not a threat to the community under 42 U.S.C. § 3604(f)(9).

3. The definition of boarding house is:
   A dwelling in which meals and lodging or just lodging are [is] furnished for compensation to more than four (4) but not more than twenty (20) persons. Provisions for meals may be made, provided cooking is done in a central kitchen and not in individual rooms or suites. For purposes of zoning, a boarding or rooming house shall be a multiple dwelling.
   Athens, Ga., Code § 9–1–4 (1987).

4. Appellants do not pursue their constitutional claims on appeal.

make reasonable accommodations in its rules, policies, practices, or services, when such accommodations may be necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling. *See* 42 U.S.C. § 3604(f).

After a bench trial, the court entered judgment against the appellants. The court held that the City of Athens had set reasonable restrictions on the maximum number of unrelated persons who may occupy a single dwelling unit and, therefore, is exempt from the instant FHA claim under 42 U.S.C.A. § 3607(b)(1). In addition, the court held that appellants had not established a prima facie case of discriminatory effect. The district court did not address the "reasonable accommodations" issue. On appeal, appellants challenge the district court's conclusions regarding their FHA claims. Because we conclude that the Athens ordinance falls within the exemption contained in § 3607(b)(1), we need not address the issues of discriminatory effect and "reasonable accommodations."

## II. DISCUSSION

### A. *Overview of Fair Housing Act and Exemptions*

The Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, enacted as Title VIII of the Civil Rights Act of 1968, was designed to prohibit discrimination on the basis of race, color, religion, or national origin in the sale, rental, and financing of housing and to assure fair housing practices. In 1974, sex was added as a protected class but otherwise the statute remained basically unchanged until 1988. *See* 42 U.S.C. § 3604(a). In 1988, Congress amended the Fair Housing Act to extend its protection to handicapped persons. Fair Housing Amendments Act of 1988, P.L. No. 100–430, 102 Stat. 1619 (1988) ("FHAA"). Congress recognized that discrimination against the handicapped is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexan-*

*der v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985). The House Report states:

> The Fair Housing Amendments Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 18, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179 [hereinafter "House Report"]. In general, the Fair Housing Act makes it unlawful

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap....

> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap....

42 U.S.C. §§ 3604(f)(1) and (2).

The FHA, however, contains a number of exemptions, which, if applicable, remove the alleged violation from the coverage of the Act. *See* 42 U.S.C. § 3604 ("except as exempted by section[] ... 3607 of this title, it shall be unlawful...."). In this case, appellees claim that the exemption relating to maximum occupancy limitations is applicable. This exemption provides: "Nothing in this subchapter limits the applicability of any reasonable local, state, or federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1).

■ While we conclude that the exemption applies in this case,[5] we note that any

---

**5.** Because we conclude that the city's action in this case falls within the maximum occupancy limitation exemption, we need not decide the

precise contours of the proof which a plaintiff must adduce in order to establish a violation under the Act. *See Metropolitan Housing Devel-*

exemptions contained in the Act are to be construed narrowly. *See United States v. Columbus Country Club*, 915 F.2d 877, 883 (3rd Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991); *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 550 (W.D.Va.1975) ("In view of the Supreme Court's holding that the Fair Housing Act must be accorded a generous construction, the general principle requiring the strict reading of exemptions from the Act applies here with even greater force.") (citation omitted). In fact, none of the few courts that have considered the exemptions have found them applicable. *See, e.g., United States v. Columbus Country Club, supra,* (religious organization exemption and private club exemption); *United States v. Hughes Memorial Home,* 396 F.Supp. 544 (W.D.Vir.1975) (religious organization exemption); *Park Place Home Brokers v. P–K Mobile Home Park,* 773 F.Supp. 46 (N.D.Ohio 1991) (housing for older persons exemption); *Lanier v. Fairfield Communities, Inc.,* 776 F.Supp. 1533 (M.D.Fla. 1990) (housing for older persons). Acknowledging the narrowness of the exemption, we turn to § 3607.

## B. *Maximum Occupancy Limitation Exemption*

In this appeal, appellants present only two arguments to support their position that the exemption is inapplicable: first, appellants argue that the ordinance is not a maximum occupancy limitation because it does not apply to all occupants, but only to those occupants who are unrelated; and second, appellants argue that the exemption does not apply because the ordinance is unreasonable.

*opment Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977) (racial discrimination), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack, Missouri,* 508 F.2d 1179 (8th Cir. 1974) (racial discrimination), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Familystyle of St. Paul v. City of St. Paul, Minn.,* 728 F.Supp. 1396 (D.Minn.1990) (discrimination against the handicapped), *aff'd,* 923 F.2d 91 (8th

### 1. The Athens Ordinance is a Maximum Occupancy Limitation

Appellants argue that the district court erred in holding that the ordinance falls within the exemption contained in 42 U.S.C. § 3607(b)(1). Appellants argue that the ordinance at issue cannot be characterized as a maximum occupancy limitation within the meaning of § 3607. Appellants urge that § 3607(b)(1) pertains only to restrictions setting a "maximum number of occupants" and that the ordinance in this case does not set an absolute maximum because there is no limit placed on the number of family members who may reside together; here the limitation is only on unrelated persons. Appellants suggest that the only maximum occupancy limitation that Congress contemplated was a limitation on the number of persons per square foot of dwelling space. Such a limitation would apply to all persons living together, whether related or not. In support of their argument, appellants cite the following passage of the House Report, stating that the maximum occupancy limitation exemption is:

> not intended to limit the applicability of any reasonable local, State, or Federal restrictions on the maximum number of occupants permitted to occupy a dwelling unit. A number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit. Reasonable limitations by governments would be allowed to continue, as long as they were *applied to all occupants,* and *did not operate to discriminate on the basis of race, color, religion, sex, national origin, handicap or familial status.*

House Report at 31; 1988 U.S.C.C.A.N. at 2192 (1988) (emphasis added).

Cir.1991); *Association of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Regulations & Permits Admin. (A.R.P.E.),* 740 F.Supp. 95 (D.Puerto Rico 1990) (same); *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720 (S.D.Ill.1989); *see also Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (addressing an alleged violation of § 504 of the Rehabilitation Act of 1973).

In addressing appellants' argument that the ordinance restricts only unrelated occupants, cases that examine discrimination, under a constitutional analysis rather than under the FHA, are helpful. In *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Supreme Court held that an ordinance that limited occupancy to members of a single family, but that defined family so narrowly that a grandmother was not permitted to live with her grandson, violated the Due Process Clause of the Fourteenth Amendment. In reaching its decision, the Court emphasized its reasons for protecting family living situations:

> Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.

97 S.Ct. at 1938 (footnotes omitted).

*Moore* distinguished *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), because the zoning ordinance there affected only *unrelated* individuals, and did not limit the number of family members permitted to live together. In *Belle Terre*, the Supreme Court rejected a constitutional challenge to a zoning ordinance which limited single family dwellings to a maximum of two unrelated persons or to any number of persons related by blood, adoption or marriage. Six students at a nearby college sought to live in a house together and were denied permission. The Supreme Court held that the zoning ordinance was rationally related to legitimate interests relating to density, traffic, and quiet, open spaces for families.

Reading *Belle Terre* and *Moore* together, it is apparent that Supreme Court precedent sanctions zoning limitations based upon the number of unrelated persons living together as a means of furthering the state's legitimate interest in controlling density, notwithstanding the absence of a similar limitation on related persons. In light of this legal reality, and in light of the prevalence of zoning regulations which limit unrelated persons without a simultaneous limitation upon related persons, see *Moore*, 431 U.S. at 513–21, 97 S.Ct. at 1942–47 (Stevens, J., concurring),[6] we decline to accept appellants' construction of congressional intent. We do not believe that Congress intended that the maximum occupancy limitation exemption would apply *only* to a limitation on the maximum number of persons per square foot of dwelling space. A careful reading of the legislative history demonstrates that Congress was merely giving examples of the type of restrictions on occupancy that would be reasonable. *See* House Report at 31; 1988 U.S.C.C.A.N. at 2192 ("*A number of jurisdictions* limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit.") (emphasis added). The list of reasonable restrictions listed in the House Report is not meant to be exhaustive.

In the instant case, the City of Athens was attempting to prevent overcrowding in the area surrounding the university without restricting family members unnecessarily. At trial, the City presented evidence that limiting unrelated individuals was the most workable solution in order to maintain the residential character of the neighborhood. The City felt that a restriction based on square footage, applicable to both related and unrelated persons, would not be feasible because too low a number would cause a family to move if a child were born while too high a number would defeat the ability of the City to protect single-family neighborhoods.

Our reasoning finds support in *Doe v. City of Butler, Pa.*, 892 F.2d 315, 321 (3d Cir.1989). There, the Third Circuit concluded that a zoning regulation was rationally related to legitimate state interests in controlling density, notwithstanding the fact

---

**6.** The record establishes that the zoning limitation in this case is commonplace. A majority of counties and municipalities limit the number of unrelated persons who may reside in a dwelling. *See* District Court Opinion at 6; *see also* R2–237.

that the regulation limited to six the number of unrelated persons who could occupy a single dwelling unit while imposing no limitation upon the number of related persons. The court rejected the argument that the zoning restriction was not related to density control because there were no limits placed on the occupancy of related persons. Applying reasoning similar to our own, the Third Circuit stated: "If the absence of an occupancy limitation on the members of a family who can live together is boot-strapped into the argument that therefore there can be no occupancy limitation for unrelated persons living together, there could never be such an occupancy limitation and *Belle Terre* would be meaningless." 892 F.2d at 321. In other words, *Moore* and *Belle Terre*, read together, indicate that a feasible method of controlling density is to place occupancy limitations on unrelated persons but not on related persons.

Having concluded that the Athens zoning restriction is a maximum occupancy limitation, we turn to appellant's argument that the Athens ordinance is unreasonable.

### 2. Reasonableness of the Athens Ordinance

■ The § 3607(b)(1) exemption applies only to *reasonable* restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Appellants argue that the Athens, Georgia, ordinance is unreasonable because it has a disparate impact on handicapped individuals. In determining the reasonableness of the ordinance, this court must strike a balance between a municipality's interest in maintaining the residential character of a particular area and the interests of the handicapped in remaining free from a zoning restriction having some disparate impact.[7] Courts have long recognized that local governments have broad power in zoning. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926) ("[B]efore [a zoning] ordinance can be declared unconstitutional, [it must be shown to be] clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.").

We turn then to the evidence of discrimination adduced by appellants at trial. The only evidence of disparate impact[8] upon handicapped persons adduced by appellants was the fact that appellants' proposed use for handicapped persons was rejected and the testimony of Reverend Lindsay that a group home for recovering alcoholics in Athens, Georgia, could not be economically feasible with fewer than 12 residents. There was no attempt to establish that the ordinance had a harsher effect on handicapped persons wanting to live in group homes than on college students or other non-handicapped persons desiring to live in group homes. While we assume *arguendo* that the ordinance had some disparate im-

---

7. In *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court recognized the need to balance the interests of the handicapped against those of the recipients of federal funds in the context of § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U.S.C. § 794:

   [*Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) ] ... struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.

   *Alexander,* 469 U.S. at 300, 105 S.Ct. at 720.

   While we are construing the FHA and not the Rehabilitation Act of 1973, the above cases are still useful to our analysis. Because the legislative history likens the purposes of the FHA amendments to that of the Rehabilitation Act of 1973, *see* House Report at 18, we look to cases interpreting the Rehabilitation Act in order to construe the FHA. Nonetheless, we note that "too facile an assimilation of [§ 504] law into [the Fair Housing Act] must be resisted." *Alexander v. Choate,* 105 S.Ct. at 716 n. 7 (assimilation of Title VI into § 504).

8. The district court concluded that the City did not intend to discriminate against handicapped persons, and appellants do not challenge this conclusion on appeal. Appellants assert only that the City's application of the zoning ordinance has a disparate impact on handicapped persons.

pact upon handicapped persons,[9] we conclude that the evidence of disparate impact upon handicapped persons is extremely weak.

Weighed against the foregoing rather slim evidence of disparate impact upon handicapped persons are the City's very substantial interests in controlling density, traffic, and noise in its single family residential districts, and in preserving the residential character of such districts. The City's purpose in adopting the zoning restriction at issue was to control the large University of Georgia student population. The City adopted its definition of "family" in the ordinance in order to protect the character of single-family neighborhoods and regulate the negative effects emanating from the student population such as overcrowding, traffic, and noise.

At trial, the City presented the testimony of Mr. Leon Eplan, a land use planner and currently the Commissioner of Planning and Development for the City of Atlanta, Georgia. Eplan testified about the effects that a large student population can have on the surrounding residential neighborhood absent measures aimed at restricting occupancy. Eplan cited the Home Park area surrounding Georgia Tech University in Atlanta, Georgia, as an example of an area that has gone from being primarily residential to an area that has increased in density, is primarily rental property, and is no longer suitable for single-family dwellings because of the increased noise and traffic. As the student population grew, the residents found it profitable to rent to students. At the time that this demand for off-campus housing grew, there was no city ordinance in place that would limit the density in the area. Thus, the neighborhood has changed its character dramatically over the years.

As noted above, and as the district court found, see District Court Opinion at 7, the most practical means of accomplishing the City's legitimate interests was a limitation on the number of unrelated persons permitted to occupy a single dwelling. The Athens restriction has the following primary effects in the affected single family residential districts: (1) to control the number of college students who may rent a single dwelling; (2) to exclude boarding houses; and (3) to exclude fraternity and sorority houses. All are clearly legitimate and serve important interests of the City. In addition, of course, the restriction had the incidental effect of excluding group homes such as the one proposed by appellants, at least those which cannot be economically operated with the permitted number of residents.

In considering whether the City's legitimate interests outweigh the disparate impact upon handicapped persons, it is also relevant that there are other areas in the City that would be available for group homes. The City presented evidence at trial that such a group home would be permitted to operate in the following zones: R.M. 1 and R.M. 2 (both multi-family residential zones); O.I. (office institutional); O.I.B. (office institutional and limited commercial), L.B. (local business); G.B. (general business), C.B.D. (central business district), and H.B. (highway business). R2–168–174. Thus, it appears that group homes of the kind appellants propose would be permitted in other residential areas of the city, as well as non-residential areas.

The Athens ordinance on its face does not draw a line between handicapped individuals and non-handicapped individuals. Rather, the legislative line was drawn between related and unrelated individuals, a distinction which Supreme Court precedent clearly permits. See *Moore* and *Belle Terre, supra.* While a local government cannot exclude handicapped individuals on the premise that "they can go elsewhere,"[10] the Fair Housing Act amendments do not require a local government to

---

9. The district court concluded that appellants had failed to prove disparate impact. In light of our resolution of this case, we need not address appellants' challenge to this conclusion. However, it is clear that the evidence of disparate impact adduced by the appellants in this case is very weak, and this fact is significant to our analysis.

10. *See* Michael P. Seng, *Discrimination against Families with Children and Handicapped Persons under the 1988 Amendments to the Fair*

permit handicapped individuals to live wherever they desire. The Act provides only that handicapped individuals be given meaningful access to housing in a nondiscriminatory fashion. While it may be true that handicapped individuals have a greater need to reside in group settings, the City of Athens has other zones that permit such access for handicapped and other individuals.

We conclude that the zoning restriction as applied in this case is reasonable, and thus the exemption is applicable. Appellants have adduced only weak evidence of disparate impact upon handicapped persons. On the other hand, the City has adduced evidence of strong and legitimate interests in controlling density, traffic, and noise in its single-family residential districts, and in preserving the residential character thereof. The City not only demonstrated that its restriction upon the number of unrelated persons who may occupy a dwelling is the only practical method of serving its legitimate interests but also adduced evidence that comparable restrictions are commonplace in the zoning regulations of counties and municipalities. The exemption contained in § 3607(b)(1) relating to maximum occupancy limitations is an attempt on the part of Congress to advance the interests of the handicapped without interfering seriously with reasonable local zoning. In this case, the City has preserved meaningful access for group homes for handicapped persons in its residential areas. We conclude that the zoning restriction, as applied under the circumstances of this case, is reasonable, and thus that the § 3607(b)(1) exemption is applicable.

Finally, appellants argue that the fact that the ordinance has some disparate impact upon handicapped persons means, *ipso facto*, that the ordinance is unreasonable. Our research has uncovered no support in the case law for that proposition. To the contrary, the relevant case law suggests otherwise. In *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661

(1985), the Supreme Court held that a Medicaid regulation, which had a disparate impact upon handicapped persons, nevertheless did not violate § 504 of the Rehabilitation Act of 1973.[11] The Supreme Court expressly rejected the argument that every disparate impact discrimination would violate the Act:

> At the same time, the position urged by respondents—that we interpret § 504 to reach all action disparately affecting the handicapped—is also troubling. Because the handicapped typically are not similarly situated to the non-handicapped, respondents' position would in essence require each recipient of federal funds first to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped. The formalization and policing of this process could lead to a wholly unwieldy administrative and adjudicative burden.... Had Congress intended § 504 to be a National Environmental Policy Act for the handicapped, requiring preparation of "Handicapped Impact Statements" before any action was taken by a grantee that affected the handicapped, we would expect some indication of that purpose in the statute or its legislative history. Yet there is nothing to suggest that such was Congress' purpose. Thus, just as there is reason to question whether Congress intended § 504 to reach only intentional discrimination, there is similarly reason to question whether Congress intended § 504 to embrace all claims of disparate-impact discrimination.

*Id.* at 298–99, 105 S.Ct. at 718–19 (footnote omitted).

In *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), the Seventh Circuit expressly rejected the argument that once a racially discriminatory effect is shown, a violation of

*Housing Act,* 22 J. Marshall L.Rev. 541, 560 (1989).

11. Cases interpreting the Rehabilitation Act of 1973 are useful in the FHA context. *See* footnote 7, *supra.*

§ 3604(a) of the Fair Housing Act is necessarily established. The Seventh Circuit held:

> We decline to extend the reach of the Fair Housing Act this far. Although we agree that a showing of discriminatory intent is not required under § 3604(a), we refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases.

*Id.* at 1290. To the same effect, *see United States v. City of Blackjack, Missouri,* 508 F.2d 1179, 1186 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

■ It is true that the context of the foregoing cases is not precisely the same as this case. The above cases were addressing the issue of whether there was a violation of the Rehabilitation Act of 1973 and the Fair Housing Act, respectively. In the instant case, the issue is the application of an exemption from the coverage of the Fair Housing Act. More precisely, the issue now under discussion is whether an otherwise reasonable zoning restriction is unreasonable, thus nullifying the exemption, *solely* because it has some disparate impact on handicapped persons. We conclude, however, that the rationale of the foregoing cases is relevant and persuasive. The fact that Congress did not intend that every disparate impact discrimination would violate the Rehabilitation Act of 1973 or the Fair Housing Act provides strong evidence that Congress also did not intend that every zoning restriction based on maximum occupancy would necessarily be unreasonable, and therefore nonexempt under the Act, merely because the restriction had some disparate impact upon handicapped persons. Thus, we reject appellants' final argument.[12]

■ For the foregoing reasons, the Athens, Georgia, zoning ordinance was reasonable as applied in this case. We conclude that § 3607(b)(1) exempts the City's action from the coverage of the Act.[13] Accordingly, the judgment of the district court is

AFFIRMED.

KRAVITCH, Circuit Judge, dissenting:

The majority holds that the Athens ordinance restricting the maximum number of

---

12. In evaluating whether the zoning ordinance is "reasonable" as required by the exemption, the dissent suggests that the reasonable accommodation provision of the Act should apply, in addition to discriminatory intent and disparate impact. We disagree; we do not think the reasonable accommodation provision is per se applicable. The statute expressly provides an exemption from the Act; if the exemption applies, then the other provisions of the Act, including the reasonable accommodation provision, do not apply. In addition, the construction suggested by the dissent would effectively nullify the exemption; that is, under the dissent's construction, the only time the exemption could apply is when there is no statutory violation in the first place. We need not decide whether the failure to make an accommodation might in other circumstances result in a determination that a zoning restriction was unreasonable, and thus the exemption inapplicable. In other words, we need not decide whether the concept of accommodation can in some circumstances inform the concept of reasonableness. We need not decide that issue in this case because it is clear that the accommodation sought by appellants would require nothing less than an exception to the zoning restriction, an exception which is not available to college students or others whose circumstances also make such

group living desirable. Under the circumstances in this case, we cannot conclude that the city's refusal to make an exception for appellants is unreasonable.

13. Because we appear to be the first appellate court to rule on this particular exemption, we take the time to distinguish a few cases where courts have found violations of the Fair Housing Act because of discrimination against the handicapped. These cases, while not considering the exemption, demonstrate that refusals to grant zoning variances or to rezone to accommodate handicapped facilities are to be examined closely for discriminatory intent or effect.

In *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court held that a city's refusal to grant a special use permit to allow construction of a group home for the mentally retarded violated the equal protection clause of the fourteenth amendment. In *Cleburne,* the city required special use permits for the operation of group homes for the handicapped but did not require permits for other uses such as hospitals and nursing homes in the same area. The city attempted to justify its requirement on the grounds that it was concerned with the negative attitude of property owners, that students from a school across the street from the

unrelated occupants living in homes zoned for single families does not violate the Fair Housing Amendments Act. This conclusion stems from the majority's belief that the ordinance falls within a statutory exemption permitting reasonable maximum occupancy restrictions that apply equally to all occupants.

In my view, the ordinance in question is neither reasonable nor an occupancy limitation that applies *equally* to all individuals. In addition, I disagree with the majority's disparate impact analysis which fails to recognize the specific definition of discrimination contained in section 3604 of the Fair Housing Amendments Act. I therefore respectfully dissent from the majority opinion.

## I. THE EXEMPTION

The majority holds that the Athens ordinance falls within the section 3607(b)(1) exemption of the FHAA because the ordinance is a reasonable occupancy limitation. This result, however, cannot be reconciled with either the plain words of the statute or its legislative history.

### A. *Maximum Occupancy Limitations*

Section 3607(b)(1) exempts certain ordinances from the requirements of the FHAA:

> Nothing in this subchapter limits the applicability of any *reasonable* local, State, or Federal restrictions regarding the *maximum number of occupants* permitted to occupy a dwelling.

(emphasis added). In its opinion, the majority seeks to reconcile this exemption with case law implying that a maximum occupancy limitation would be unconstitutional if applied to families. See *Moore v. City of East Cleveland, Ohio*, 431 U.S.

---

proposed site might harass the residents, and that the location was on "a five hundred year flood plain." In addition, the city did put forth some concerns about population density, but failed "to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit." 105 S.Ct. at 3260. The Court rejected the City's arguments and concluded that the reasons given for the special use permits were not rationally related to a legitimate government purpose. 105 S.Ct. at 3258.

The present case can be distinguished from *Cleburne* in two respects. First, this case does not involve the requirement of a special use permit for the operation of The Potter's House. Group homes for the handicapped are not singled out and treated differently than any other dwelling that would house a large number of unrelated persons. *See also Doe v. City of Butler, Pa.*, 892 F.2d 315 (3d Cir.1989) (distinguishing *Cleburne* on same ground). Second, while in *Cleburne*, there were other group dwellings in the same area, there is no evidence in the present case that the City of Athens has recently permitted other groups to locate in a single-family zone. Therefore, the City's concerns relating to density are more credible as the ordinance has been applied across the board to uphold the residential character of the Ruth Street neighborhood. Thus, the City of Athens ordinance does not appear to rest on an irrational fear of the handicapped such that the FHA is violated.

Similarly, in *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2nd Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), the Second Circuit found that a town violated the Fair Housing Act by refusing to rezone a parcel for multi-family housing. In *Huntington*, the overwhelmingly white suburban town had an ordinance that, on its face, limited the private construction of multi-family housing to one urban renewal area in town, where 52% of the residents belonged to a minority. 844 F.2d at 930. In addition, the only justification for the ordinance proffered by the town was that it encouraged developers to invest in that area of town. Under these circumstances, the court of appeals found a disparate racial impact and a violation of the FHA. The Supreme Court affirmed stating that "we are satisfied on this record that disparate impact was shown, and the sole justification proffered to rebut the *prima facie* case was inadequate." 109 S.Ct. at 277.

In distinguishing *Huntington*, we note that the ordinance involved in that case could not be characterized as a maximum occupancy limitation within the meaning of § 3607. The ordinance there was not singled out for special exempt status by Congress as was the Athens ordinance. In addition, multi-family housing was relegated to one particular area of Huntington; such is not the case in Athens. The group home proposed by appellants could be located under the zoning ordinance in several other areas of Athens, including residential areas. Finally, the *Huntington* court found a substantial adverse impact upon minorities and weak and inadequate town justifications, 844 F.2d at 938, 940; by contrast, the disparate impact in this case is extremely weak and the city's legitimate interests are very substantial.

494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Doe v. City of Butler, Pa.*, 892 F.2d 315, 321 (3d Cir.1989).[1] This perceived constitutional prohibition means that a municipality can only rely on the section 3607 exemption for ordinances which apply to unrelated occupants; an ordinance which applies to families would be struck down as unconstitutional before an FHAA analysis was ever begun. Consequently, if we do not find that the Athens ordinance falls within the section 3607 exemption (because it inequitably applies only to unrelated occupants), we will have created a situation in which no ordinance can ever fall within the exemption. In other words, we will have rendered the exemption meaningless.

The majority correctly notes that we are obligated to read the statute in a manner that does not render it ineffectual. I agree that "[i]t is our duty to give effect, *if possible*, to every clause and word of a statute, rather than emasculate a section." *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (citations omitted, emphasis added). The majority, following the reasoning of *Doe*, argues that we will be violating this duty if we "emasculate" the statute by finding that the Athens ordinance does not fall within the section 3607 exemption.

Although I agree with the sentiments of the majority concerning our obligation to "save" the exemption, I disagree with the majority's application of this doctrine. Underlying our duty to give meaning to each word of a statute is the presumption that in

so doing we will most effectively fulfill the intent of Congress. However, when more explicit evidence of Congressional intent is available, it makes sense to give effect to such evidence rather than resort to an artificial reading of a statute.

In this case, the legislative history unambiguously states that maximum occupancy limitations are only permissible if "applied *equally to all occupants*, and [do] not operate to discriminate on the basis of ... handicap." House Report at 31; 1988 U.S.C.C.A.N. at 2192 (1988). The Athens ordinance does not apply "equally" to all occupants; it only applies to unrelated occupants. We should not ignore this clear statement of Congressional intent and squeeze the Athens ordinance into an exemption from which it is so obviously excluded, even if effectuating Congressional intent *may* mean rendering the exemption useless.[2] Our mandate to render every word of a statute meaningful is not absolute. We are only required to save a statute "if possible," *Menasche*, 348 U.S. at 538–39, 75 S.Ct. at 520, and in this case, the plain wording of the statute and the legislative history makes the reading suggested by the majority impossible.

### B. *Reasonable Limitations*

Even if the ordinance is a maximum occupancy limitation as defined by the exemption, it cannot be considered "reasonable". Section 3607(b)(1).

The majority seeks to prove the reasonableness of the ordinance by balancing the interests of the handicapped in access to

---

1. For purposes of this analysis, I assume that the majority is correct in its belief that it would be unconstitutional to apply a maximum occupancy limitation to families. A court might infer this result from case law; the Supreme Court, however, has not directly addressed this issue. Indeed, one concurring justice in *Moore* noted that a city could achieve the goal of population limitation through a restriction that is reasonably related to the ends of preventing overcrowding, i.e., absolute restrictions on the number of occupants, whether they be related or unrelated. 97 S.Ct. at 1946, n. 16 (Stevens, J. concurring). In *Doe*, a non-controlling Third Circuit case, the court did state, in dictum, that a maximum occupancy restriction cannot con-

stitutionally be applied to limit the number of family members permitted to share a dwelling.

2. Our reading of the exemption and the legislative history is particularly appropriate given the lack of a clear Supreme Court statement of the applicability of occupancy restrictions to families. *See supra* note 1. In addition, it is important to note that a negation of the exemption would not prohibit municipalities from effectuating the goal of population limitations. Maximum occupancy ordinances not protected by the section 3607 exemption would merely be subject to the provisions of the FHAA. In the case at hand, these provisions would require the city to make reasonable accommodations like those discussed *infra*.

housing against the municipality's interests in maintaining the residential character of a particular neighborhood. In an attempt to measure the harm to the handicapped population, the majority engages in a discussion of the "discriminatory impact" of the ordinance. Rather than recognize the *specific definition of discrimination contained in the FHAA*, the majority uses a disparate impact analysis that not only ignores the mandate of the statute, but is inappropriate in the context of evaluating *discriminatory* impact on handicapped persons.

Section 3604(f)(3) of the FHAA states that:

> For the purposes of this subsection, discrimination includes—
>
> (B) *a refusal to make reasonable accommodations* in rules, policies, practices, or services, when such accommodation may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

(emphasis added). The statute explicitly equates discrimination with a failure to make reasonable accommodations and nowhere implies that a disparate impact analysis is appropriate. Indeed, a disparate impact analysis is particularly inappropriate in the situation of handicapped individuals. Such an analysis should be undertaken in situations in which groups that are entitled to equal treatment are not being treated as equals, not when a protected group is entitled to special treatment. Because handicapped people are entitled by law to preferential treatment and because preferential treatment is necessary to afford them equal access to housing, a disparate impact analysis is useless in this context and in fact negates the entire intent of including handicapped people within the FHAA.

In its opinion, the majority fails to mention the definition of discrimination set forth in the statute. Instead, it opines that a) "[t]here was no attempt to establish that the ordinance had a harsher effect on handicapped persons wanting to live in group homes than on college students or other non-handicapped persons desiring to live in group homes," and that b) in any case, the evidence of disparate impact is "extremely weak."

The majority's disparate impact language appears to stem from the district court's order which relied on *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977). *Metropolitan* holds that the only way to prove a Fair Housing Act violation is by 1) a showing of discriminatory intent towards the protected class, or 2) proving disparate impact upon the protected class. *Metropolitan,* a racial discrimination case under the old FHA, was decided well before the amendments to the Act which added protection for handicapped people. The *Metropolitan* standard is superseded by the FHAA, which specifically defines a violation with respect to handicapped claimants.

*Doe,* which the majority relies upon to bolster its analysis, similarly is inapplicable to this case because it involved an allegation of discrimination on the basis of sex. In *Doe,* plaintiffs challenged, as sexually discriminatory, a local zoning ordinance that limited the number of unrelated occupants to six and consequently excluded a battered woman's shelter from the area. The court upheld the ordinance reasoning that there was no greater impact on these *women* than on a group of recovering *male* alcoholics seeking to establish a group home in the same neighborhood. *Id.* at 323. Reliance on *Doe* is as misplaced as reliance on *Metropolitan;* both these cases involve complaints of inequitable treatment by groups who are entitled to be treated as equals. In the case at hand, the potential occupants of the house are requesting inequitable treatment, treatment to which they are entitled by operation of the FHAA.

It is irrelevant, therefore, that the appellants may have failed to prove disparate impact. To establish a violation of the FHAA, they are only required to prove discrimination, i.e., a failure of the city to make reasonable accommodations that *may* be necessary to allow them equal access to

housing.  Section 3604(f)(3).[3]

### C. *Balancing*

The majority weighs the "weak evidence" of disparate impact on the handicapped men against the governmental interest in controlling density, traffic, and noise in its single-family residential districts.  Even if the standard required such a balancing of interests,[4] the ordinance would still violate the FHAA.  It is the governmental interest here that is weak, as evidenced by the municipal planning department's determination that the proposed group home "would not burden the provision of municipal services such as transportation, water, and sewage."  In comparison, the interest of the handicapped men is strong because they are being denied a statutorily defined right: the reasonable accommodation necessary to afford them equal opportunity to use and enjoy the particular dwelling.

### D. *Reasonable Accommodation*

Prior to instigating this litigation, plaintiffs suggested two accommodations that would have prevented the Athens ordinance from violating the FHAA.  They asked the city to redefine "family" to include groups of handicapped people who may need to live in group situations because of their handicap.  In the alternative, they requested a spot exemption to allow this particular group home to operate at the proposed located despite the single family zoning requirement.  Given the balancing discussion provided above, either of these routes must be considered no more than the "reasonable accommodation" required by the FHAA.

## II.  CONCLUSION

Because the Athens ordinance does not apply *equally* to all potential occupants and because the city has discriminated against this group of recovering alcoholics by not making reasonable accommodations, I believe the city has violated the FHAA.  I therefore respectfully dissent from the majority opinion.

---

**3.** The language of the statute is liberal.  Reasonable accommodation is required if such concession *may* be necessary to a handicapped person's ability to use and enjoy a dwelling.  Section 3604(f)(3).

**4.** As mentioned above, the proper question is whether or not reasonable accommodations have been made, not what the relative impacts are.